IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| **Russell K. Stepp,** | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:08cv665 (LO/JFA) |
| | ) | |
| **Roy Cherry, et al.,** | ) | |
| Defendants. | ) | |

FILED
AUG 13 2009
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

## MEMORANDUM OPINION

Russell K. Stepp, a Virginia inmate proceeding pro se, filed this civil rights action, pursuant to 42 U.S.C. § 1983. Defendants filed a Motion for Summary Judgment, a Memorandum in Support of the Motion, and a Notice pursuant to Local Rule 7(K) and Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), informing plaintiff that he was entitled to file a response opposing the motion within twenty days of the date on which defendants' Motion for Summary Judgment was filed. Plaintiff filed a Response to the Motion, as well as a Motion to Amend the Complaint and a Motion for Discovery. For the reasons that follow, plaintiff's Motion to Amend and Motion for Discovery will be denied as moot, and defendants' Motion for Summary Judgment will be granted.

### I. Procedural Background

Plaintiff filed a civil rights complaint against numerous officials at the Hampton Roads Regional Jail ("HRRJ") for violations of his Eighth and Fourteenth Amendment rights. By Order dated July 28, 2008, plaintiff was directed to particularize and amend his complaint; execute and return an application to proceed in forma pauperis, a form indicating his consent for prison officials to deduct the $350.00 filing fee in installments from plaintiff's prison account, and a verified statement concerning his exhaustion of his institution's administrative grievance process; and inform

the Court of the date on which he delivered his complaint to prison officials to be mailed, all within thirty days of the date of the Order. On August 28, 2008, plaintiff complied with the July 28 Order by submitting an amended complaint, a verified statement concerning his exhaustion of his institution's administrative grievance process, an affidavit informing the Court when he delivered his complaint to prison officials, a form indicating his consent to the collection of the filing fee from his inmate account, and an in forma pauperis application.

In his amended complaint, plaintiff raised seven claims against thirteen named defendants. By Order dated December 18, 2009, all but one of plaintiff's claims were dismissed for failure to state a claim, pursuant to 28 U.S.C. § 1915A(b)(1). Plaintiff's claim remained pending solely on Claim 4, which alleged that defendants Ward, Garrett, Moabe, Powell, and Casper, all officials at the Hampton Roads Regional Jail ["HRRJ"], violated plaintiff's Eighth and Fourteenth Amendment rights by failing to protect plaintiff, because they did not intervene and prevent several gang members from attacking plaintiff. By the December 18 Order, the Clerk was directed to send the complaint and a notice and waiver of service in this action to all remaining named defendants at HRRJ.[1]

---

[1] At the time the complaint was served, the Court mistakenly omitted its directive to plaintiff's correctional institution to submit the initial filing fee. By Orders dated April 23, 2009, and June 9, 2009, plaintiff's correctional institution was directed to submit an initial filing fee of $11.48. However, the Court received a Report of Violation of the Consent Order from HRRJ officials on July 9, 2009, which indicated that plaintiff had a zero balance in his inmate account. Although typically a violation of the consent order would result in dismissal, such an action is not appropriate here, where the initial filing fee was never transmitted due to an omission by the Court in its Order. Moreover, in his July 24, 2009 letter motion, plaintiff indicates that he suffered a heart attack in April 2009, and though he is now physically capable of working, he has not yet been able to secure employment at his correctional institution. As a result, the Court will not dismiss the complaint for failure to pay the initial filing fee, however, plaintiff still will be responsible for paying the filing fee in full.

On January 16, 2009, the Clerk received the waiver of service from defendants Garrett, Casper, and Ward, however, no waiver was received from defendants Powell or Moabe. On February 3, 2009, counsel for defendants Garrett, Casper, and Ward submitted a Motion for Summary Judgment, a Memorandum in support of the Motion, and a Roseboro Notice. Plaintiff filed a Response to the Motion on February 25, 2009. Plaintiff also sought to amend his complaint on the ground that after reading the defendants' Memorandum, it was revealed that the defendant thought to be "Moabe" was actually named R. Moechoe. Defendants filed an Opposition to the Motion for Leave to Amend on March 5, 2009, arguing that amendment would be futile because plaintiff's claims were without merit. By Order dated March 30, 2009, the Court granted plaintiff's Motion to Amend his claim to reflect defendant Moechoe's correct name, and the notice and waiver of service were re-sent to that defendant at HRRJ by the same Order. Also by the same Order, the Court directed the Clerk to issue a summons through the United States Marshal to defendant Powell at HRRJ.

Moechoe returned the waiver of service on April 17, 2009, and through counsel filed a Motion for Summary Judgment, a Memorandum in Support identical to that filed by counsel for defendants Ward, Garrett, and Casper, and a Roseboro Notice on May 5, 2009. On June 5, 2009, the United States Marshal Service returned the summons issued for defendant Powell unexecuted, indicating that he no longer worked at HRRJ and had resigned on October 16, 2006. As a result, the Court ordered plaintiff provide additional identifying information on Powell within thirty days of the June 22, 2009 Order. Plaintiff was informed that should he fail to provide sufficient information and the Court is unable to effect service on Powell, and he is not otherwise served within 120 of filing, Powell would be dismissed from the instant action without prejudice, pursuant to Rule 4(m)

3

of the Federal Rules of Civil Procedure. On July 24, 2009, plaintiff sent a letter motion to the Court, in which he sought to amend his complaint and to initiate discovery. However, plaintiff did not provide additional identifying information on Powell. Because neither the Court nor plaintiff have been able to effect service on defendant Powell and more than 120 days have passed since plaintiff filed this action, defendant Powell will be dismissed without prejudice.

## II. Factual Background

As explained above, plaintiff's complaint remains pending solely on Claim 4, which alleges that defendants failed to protect plaintiff as he was being attacked by other inmates. Plaintiff recounts the following relevant facts in his Amended Complaint. On June 21, 2006, plaintiff was attacked and "viciously beaten" by several prisoners in HRRJ housing pod 3-2, without provocation. According to plaintiff, defendants Ward, Garrett, Moechoe, Powell, Casper, and several other unidentified officers responded to the altercation, but rather than intervening, they remained outside the pod area and viewed the altercation through the glass partition. Plaintiff further alleges that the attack continued for "several minutes" after security arrived, "giving the defendants ample time to react." He asserts that defendants "waited until the assailants grew tired of beating plaintiff, and other persons, and dispersed, at which time defendants entered the pod area." Plaintiff alleges that he sustained numerous injuries, including "several blows to the head and face by a weapon fashioned out of batteries wrapped in a sheet, puncture wounds and cuts about the head and chest area, severe contusions to the eyes, nose and head area, a severely smashed right hand, broken fingers, sprained neck and back, which severely aggravated a pre-existing injury to plaintiff's neck."

After the incident, plaintiff was taken to the medical facility at HRRJ and was treated by the nurse on duty, who washed plaintiff's wounds, applied bandages where necessary, and informed

plaintiff that he might have a concussion and should be kept under observation. After being treated, plaintiff was taken to a segregated pod, where he alleges that he experienced dizzy spells and lost consciousness at least once. On June 23, 2006, plaintiff was taken to a local hospital for further treatment. Upon his return to HRRJ, plaintiff was placed in a medical pod. On June 27, 2006, plaintiff received a disciplinary report, resulting from the June 21 incident, for fighting with another person. After pleading guilty to the charge, plaintiff was sentenced to six days in isolation, for which he was credited with time served, and was referred to the institutional classification committee ("ICC") for review. After obtaining a copy of his formal ICC review form, plaintiff found that an ICC hearing was held on June 28, 2006, and that he was sentenced to administrative segregation security due to the severity of the incident.

In their Memorandum in Support of the Motion for Summary Judgment, defendants dispute plaintiff's contention that the attack was unprovoked. According to an affidavit by Captain Taunya D. Hatchett, an officer who conducted an investigation of the June 21 altercation at HRRJ, plaintiff and two other inmates were standing near a cell occupied by two other inmates. See Mem. in Supp. Aff. A - Hatchett 1. When one of the inmates inside the cell became displeased at the noise from outside the cell, he made threats and appeared to retrieve what was perceived to be a knife. At that time, one of the inmates outside the cell entered and began to fight with the inmate inside the cell. See Mem. in Supp. Aff. A - Hatchett 1. Once the initial fighting between the two broke out, several other inmates got involved, including plaintiff, who entered the cell and began to fight. See Mem. in Supp. Aff. A - Hatchett 1-2. According to Hatchett, witnesses reported that plaintiff was struck from behind with a sock filled with batteries. See Mem. in Supp. Aff. A - Hatchett 2.

After the altercation began, defendant Moechoe, who was in the housing unit where the

fighting broke out, called a "Code 10-33," indicating an inmate disturbance, and requested that officers respond. Mem. in Supp. Ex. A., Moechoe Aff. 1. As he waited for assistance to arrive, Moechoe instructed "the pod to lockdown" and secured the doors "so that the inmates could not block them and interfere" with his attempts to secure the area. Mem. in Supp. Ex. A., Moechoe Aff. 2. As fighting continued to break out among additional inmates in other areas, Moechoe called for additional backup. Mem. in Supp. Ex. A., Moechoe Aff. 2. He states in his affidavit that within less than five minutes, approximately ten to fifteen officers had responded. Mem. in Supp. Ex. A., Moechoe Aff. 2. Once the officers entered the housing unit, Moechoe maintained responsibility for controlling the doors. Mem. in Supp. Ex. A., Moechoe Aff. 2. He asserts that he had "no knowledge that plaintiff was in danger of injury from other inmates until the fighting broke out."

Defendant Sergeant Earl Ward, a supervising officer at HRRJ, attests that Moechoe responded according to HRRJ policy. Mem. in Supp. Aff. B. - Ward 1. The policy provides that "in all incidents involving more than one subject or where the use of force may be required to control an incident, the staff member should call for assistance," and also that "under normal circumstances officers will not enter a cell occupied by inmates alone." Mem. in Supp. Aff. B. - Ward 1. The policy further states that the officer "will enter the cell/pod with a minimum of one back up officer present." Mem. in Supp. Aff. B. - Ward 1-2. Finally, officers at HRRJ are instructed "to first secure all non-fighting inmates in their cells and wait for 'appropriate backup' before entering a cell or pod and attempting to break up a fight between inmates." Mem. in Supp. Aff. B. - Ward 2.

Ward states that when he responded to Moechoe's call, he "observed multiple fights between black and white inmates." Mem. in Supp. Aff. B. - Ward 2. He began to bang on the glass and shout "lockdown," but the fighting continued and "master control" had to radio for more assisting officers

to respond to the housing unit. Mem. in Supp. Aff. B. - Ward 2. Less than five minutes later, when those ten to fifteen additional officers arrived, Ward entered the pod with the officers, they secured the pod, and took the inmates involved, including plaintiff, to the medical department. Mem. in Supp. Aff. B. - Ward 2. Following the incident, Ward undertook an investigation, which revealed that when the first two inmates began to fight, a third inmate entered the cell to assist and plaintiff hit that inmate and knocked him down. Mem. in Supp. Aff. B. - Ward 2. Ward swears in his affidavit that he had no knowledge that plaintiff was in danger of injury from other inmates. Mem. in Supp. Aff. B. - Ward 2.

Defendant Sergeant Tina Garrett responded to the call for assistance in the housing unit where the altercation was taking place. However, she states in her affidavit that by the time she arrived, "the earlier responding officers had the situation under control." Mem. in Supp. Aff. C. - Garrett 1. She adds that she never witnessed any fighting, and that she had no knowledge that the plaintiff was in danger of injury from any other inmates. Mem. in Supp. Aff. C. - Garrett 1-2.

Lastly, defendant Alvin Casper, an officer at HRRJ, was not at the correctional institution or working at the time of the incident. Mem. in Supp. Aff. D. - Casper 1. According to his affidavit, his shift on June 21 began at 7:30 p.m., which was two hours after the fighting occurred, and he was assigned to another housing unit. Mem. in Supp. 3; Mem. in Supp. Aff. D. - Casper 1. He also states that he had no knowledge that plaintiff was in danger of injury from other inmates. Mem. in Supp. Aff. D. - Casper 1.

In his Response to the Motion for Summary Judgment, plaintiff asserts that when officers responded to the call for assistance, they arrived and "passively remain[ed] on the other side of a glass partitioned security door and watch[ed] as plaintiff (and another inmate) were viciously beaten,

cut and stabbed." Resp. to Mot. 1 (unnumbered page). He also adds that when he approached the door "alone, pleading for Sgt. Ward and other defendants to open the door and allow plaintiff to exit the pod into safety, Sgt. Ward displayed what can only be viewed as a cruel disregard for the safety of the plaintiff." Resp. to Mot. 1-2 (unnumbered pages). Plaintiff states that by refusing him "the relative safety" of a secured area, defendants exhibited deliberate indifference to his safety and his life. Resp. to Mot. 2 (unnumbered page). He states that defendants ordered him "back onto the floor, to force him to be subjected, against his will, to another beating." Resp. to Mot. 2 (unnumbered page).

Plaintiff also submitted an affidavit, in which he alleges that the area of HRRJ where the attack occurred is reserved for violent offenders, but that six pods in three buildings, including unit 3-2 where the incident took place, "are operated in a severely loose fashion." Aff. in Opp. 1. He alleges that there are no officers on the floor of the jail, "nor do the officers make any attempt to make security walk throughs each hour as they are required to do." Aff. in Opp. 1-2. As a result, plaintiff claims that this "total lack of security creates a specific effect on the mentality of the prisoners, one which can best be described as: the law of the jungle where the strong survive and the weak are preyed upon." Aff. in Opp. 2. He adds that the high population of gang members and the presence of individuals from various cities in the area creates a "natural rival component" between gangs and cities. Aff. in Opp. 2. Plaintiff explains that there are "daily beatdowns" that are not observed by officials, and even when they are, these incidents have become so "commonplace" that they are responded to "slowly, or not at all." Aff. in Opp. 2.

In the specific 3-2 housing unit in which the fight occurred, plaintiff states that there was a "predominant gang" that had repeatedly attacked other prisoners in front of jail officials, but was

permitted to remain housed in the same unit. Aff. in Opp. 2-3. He adds that it was "common knowledge among prisoners and officials" that these gang members possessed "at least one knife and several other makeshift weapons," including a sharpened piece of metal, a cloth that contained batteries, and peanut butter jars filled with water and put in laundry bags for use as clubs. Aff. in Opp. 3.

Plaintiff also disputes defendants' account that plaintiff inserted himself into the altercation. Rather, plaintiff alleges that after the fighting broke out, an inmate put an "ice pick type weapon against plaintiff's neck" and ordered him into the cell. Aff. in Opp. 4-5. Plaintiff states that he was then stabbed in the neck area, and he then "began throwing punches" at the inmate who had grabbed him. Aff. in Opp. 5. He claims he was blocked from exiting the cell and beaten for several minutes until he escaped. Aff. in Opp. 5. He adds that after coming onto the floor, he was attacked "from several directions" and beaten and struck with "several different weapons by several different people." Aff. in Opp. 5-6. He also asserts that contrary to defendants' assertions, it is "not true" that different fights were taking place at the same time. Aff. in Opp. 6. Plaintiff states that he was "being beaten by his assailants from one area of the pod to another." Aff. in Opp. 6. He again explains that when he saw officers at the door, he approached, asked defendant Ward to let him out, and Ward told plaintiff to go to his cell. Aff. in Opp. 6. Plaintiff told Ward that his cell was locked, and Ward ordered him back onto the floor where plaintiff states he was again attacked by several inmates. Aff. in Opp. 6.

Finally, plaintiff alleges that during his time in HRRJ, he witnessed multiple attacks, but he never saw "any effort on the jail staff's part to attempt to regulate or control weapons through searches or any other means," and he never witnessed a fight "being broken up." Aff. in Opp. 8.

9

Plaintiff states that the policy of the jail was "to stand outside the area and let the fight end, then go in and clean up the mess." Aff. in Opp. 8. Plaintiff alleges that this policy poses a serious risk of harm to each and every individual at HRRJ. Aff. in Opp. 8. In support of his allegations, he also attaches an affidavit of a former HRRJ inmate, who was housed in the 3-2 unit until approximately one week before the June 21 incident occurred. In this affidavit, Roderick R. Williams-El states that the same men who attacked plaintiff had attacked others at some point before this altercation, and that the HRRJ policy is to wait outside the door and "watch fights until they end, then enter the pod areas and carry out the wounded." Aff. 1 (Docket # 22). He also states that as a "high stature member of a well-known gang," his influence has been used by guards to keep the peace and has allowed him "special treatment" by several officers, including Sergeant Ward, who has admitted that he is affiliated with a specific gang. Aff. 2 (Docket # 22). Finally, he states that he has "personally witnessed orchestrated fights at times between prisoners for the sole benefit of the jail staff's entertainment." Aff. 2 (Docket # 22).

### III. Standard of Review

In reviewing defendants' Motion for Summary Judgment, the Court must view the facts in the light most favorable to the party opposing the motion. Porter v. U.S. Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997). Summary judgment is appropriate where there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A "genuine" issue of material fact is present "if the evidence is such that a reasonable jury could . . . return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "When a motion for summary judgment is properly made and supported . . ., an opposing party may not rely merely on allegations

or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Unsubstantiated, conclusory claims without evidentiary support are insufficient to satisfy a non-moving party's burden on summary judgment. Carter v. Ball, 33 F.3d 450, 461-62 (4th Cir. 1994); Goldberg v. B. Green & Co., 836 F.2d 845, 848 (4th Cir. 1988). Moreover, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Anderson, 477 U.S. at 247-48) (internal quotation marks omitted). Accordingly, "when opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Id.

## IV. Analysis

Plaintiff alleges that defendants failed to protect him in violation of his Eighth Amendment right to be free from cruel and unusual punishment. It is true that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994). However, it is not the case that "every injury suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." Id. at 834. A prison official only violates the Eighth Amendment when two requirements are met. Id. First, a plaintiff must show, objectively, there has been a sufficiently serious deprivation. Id. This requires a plaintiff demonstrate that he has sustained "a serious or significant physical or emotional injury resulting from the challenged conditions," or that "a substantial risk of such serious harm resulting from the prisoner's exposure to the challenged conditions" exists. Odom

11

v. S.C. Dep't of Corr., 349 F.3d 765, 770 (4th Cir. 2003).

Second, a plaintiff must present evidence that prison officials had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. In other words, prison officials must have been deliberately indifferent to the plaintiff's health or safety. Odom, 349 F.3d at 770. A prison official is deliberately indifferent if he knows of and disregards "an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. The standard evinces a duty of reasonable safety. Accordingly, even if prison officials "actually knew of a substantial risk to inmate health or safety," they may be "found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Farmer, 511 U.S. at 844.

Ultimately, plaintiff has failed to meet his burden on summary judgment for establishing a genuine issue of material fact for trial regarding his Eighth Amendment claim. Even assuming he satisfies the first requirement of injury, and construing the facts in the light most-favorable to plaintiff, the allegations are insufficient to demonstrate that any of the defendants had a sufficiently culpable state of mind. First, although plaintiff named Garrett and Casper in his Amended Complaint, he does not dispute their respective affidavits regarding their absence during the altercation and their lack of any knowledge regarding a risk of injury to plaintiff. In fact, plaintiff only names Sergeant Ward specifically in his Response to the Motion, and uses only the general term "defendants" when asserting his failure to protect claim. At most, plaintiff has done no more than make unsubstantiated, conclusory claims regarding the presence of all defendants during the altercation, which are without evidentiary support and are insufficient to satisfy plaintiff's burden on summary judgment. See Carter, 33 F.3d at 461-62. As a result, summary judgment will be

12

granted in favor of defendants Garrett and Casper.

Second, plaintiff similarly has failed to demonstrate the existence of a material factual dispute regarding defendant Moechoe's response to the altercation. Unlike Garrett and Casper, Moechoe admits that he was in the housing unit when the fighting broke out. In response to the situation, he alerted other officers about the inmate disturbance and requested back up. Following HRRJ policy, he instructed the pod to go on lockdown, secured the doors, and attempted to secure the area. He then called for additional back up, and when those officers arrived, Moechoe continued to control the doors. Moechoe asserts, and plaintiff does not dispute, that Moechoe had no knowledge that plaintiff was in danger of injury from other inmates until the fighting broke out.

Once fighting did break out, and plaintiff was facing the risk of injury, Moechoe's actions cannot be said to be anything more than a reasonable response to the risk, although the injury to plaintiff "ultimately was not averted." Farmer, 511 U.S. at 844. As noted above, plaintiff states generally that "defendants" failed to protect him once they responded to Moechoe's call, by remaining outside the "glass partitioned security door." Resp. to Mot. for Summ. J. 1. Yet, there is simply nothing in the pleadings to demonstrate that Moechoe exhibited deliberate indifference to plaintiff. Although plaintiff characterizes the HRRJ policy as one that allows officials to remain outside the area until a fight has ended, and then "go in and clean up the mess," Aff. in Opp. 8, his general disagreement with the policy does not undermine the reasonableness of Moechoe's actions in light of the circumstances present during the altercation. Even though plaintiff does dispute that there were multiple fights going on throughout the pod area, he admits that there was an altercation involving, at minimum, himself and three other inmates, and that weapons were involved. See Aff. in Opp. 4-6. In fact, plaintiff also admits that "several other gang members," in addition to the

original participants, ultimately joined in the fighting in the cell, and that once plaintiff escaped, additional inmates attacked plaintiff. See Aff. in Opp.4-5. Thus, Moechoe's decision to follow HRRJ policy that "in all incidents involving more than one subject or where the use of force may be required to control an incident, the staff member should call for assistance" was reasonable. Numerous individuals had gotten involved in the altercation, and Moechoe would have put his own safety at risk had he not waited for "appropriate back up" before entering a cell or pod and attempting to break up the fighting among the inmates. Plaintiff has failed to allege facts sufficient to create a genuine issue as to the material facts relating to Moechoe's response, and as a result, summary judgment will be granted in favor of defendant Moechoe.

Although he presents more detailed allegations regarding the actions taken by defendant Ward, here too plaintiff has failed to demonstrate the existence of a genuine issue of material fact necessary to survive summary judgment. Ward contends that when he responded to Moechoe's call for officers, he witnessed fighting between black and white inmates, he shouted for lockdown from outside the door, the inmates did not respond, and additional back up was required. Within five minutes the officers had arrived, and Ward entered the pod with the officers, secured the area, and took the injured inmates to the medical department. Again, plaintiff does not dispute these aspects of Ward's account of the incident.[2] Instead, plaintiff asserts that after he escaped from the cell where he was being attacked, he approached the door behind which Ward was standing, asked Ward to let him out, and Ward instructed him to go back to his cell. When plaintiff told Ward his cell was

---

[2] Plaintiff does expressly dispute the fact that he was an aggressor in the altercation, however, this fact is not material, as it has no bearing on the ultimate disposition of plaintiff's claim. Whether plaintiff was an aggressor does not impact the determination of whether any of the defendants had the requisite culpable state of mind.

14

locked, Ward ordered him back out onto the floor of the housing unit. Plaintiff states that when he did that, he was again attacked by other inmates.

Although plaintiff may have disagreed with Ward's refusal to let him leave the pod, as with defendant Moechoe, there is nothing to demonstrate that Ward had the requisite culpable state of mind necessary to establish a violation of plaintiff's Eighth Amendment rights. As already noted, numerous individuals were involved in this altercation, some of whom had weapons, and it was not unreasonable for Ward to refuse plaintiff's request to be let out in light of the unsecured nature of the pod at the time plaintiff sought to exit. Plaintiff also admits that he was "throwing punches" and actively engaged in fighting and violent behavior, making him a security risk on his own. As Ward stated, and plaintiff does not dispute, additional back up was present less than five minutes after they were summoned, and Ward and other officers immediately entered and were able to secure the area. Unlike in Odom, 349 F.3d at 771-72, where officers were forewarned of impending attacks on Odom, watched as inmates tried to break into the cage in which Odom was confined, ignored commands to remove Odom from the cage, witnessed inmates attack Odom once they managed to break in, and provided no explanation for why they did not respond to Odom's requests for assistance, Ward's actions were reasonable in light of the circumstances surrounding the incident. It is not that the officers took no action, but rather that once they became aware of the risk of harm to plaintiff, they "immediately mobilized to take control of the situation," obtained assistance, and prepared to safely intervene when it was appropriate and when sufficient officers were on hand to control the situation. Winfield v. Bass, 106 F.3d 525, 532 (4th Cir. 1997). As a result, summary judgment will be granted in favor of defendant Ward.

In addition to his allegations regarding these four named defendants, plaintiff also makes

numerous allegations regarding the general safety at HRRJ and the incidents of violence that have occurred since he was incarcerated there. However, these allegations are not relevant to disposition of his claim of failure to protect. Plaintiff asserts that there is generally insufficient security in the 3-2 unit where the fighting took place, that officers do not conduct regular walk-throughs of the unit, and that rivalries exist between various gangs and inmates from different cities. Yet, he does not allege that there was insufficient security on the day the incident took place, that insufficient security was responsible for the attack he experienced, or whether there was some connection between his allegations of gang activity and what took place on June 21.[3] He also explains that when other attacks have occurred, the response by HRRJ officials has been slow or non-existent, although he does not allege that this was the case on the day he was assaulted. Plaintiff adds that a gang was permitted to remain housed in the 3-2 unit even after they had attacked other inmates in front of jail officials, and that officials knew these gang members had weapons. Nonetheless, he does not allege that this specific gang was responsible for his injuries. In the affidavit he attaches from a former HRRJ inmate, the inmate asserts that defendant Ward is affiliated with a gang, although there is nothing to suggest this in any way played a role in the June 21 incident. The inmate also claims that he has witnessed fights between prisoners for the sole benefit of jail staff's entertainment, but again no connection is made between this statement and the attack on plaintiff. Although these claims may reflect general problems with the facility, none of these allegations are related to the claim that plaintiff has raised. Whether any of these matters are true does not alter the Court's determination

---

[3] The Court notes that in his amended complaint, plaintiff did allege that two defendants no longer a party to this action told plaintiff that the individuals who attacked plaintiff were part of a gang that had previously attacked other inmates. However, plaintiff never alleged that any of the defendants remaining in this action were aware of this, thus, there is nothing to indicate that those defendants had any knowledge of a risk of injury to plaintiff prior to the altercation actually taking place.

16

that plaintiff has failed to demonstrate a genuine issue of material fact, and summary judgment must be granted in favor of all remaining named defendants.

Motion to Amend Complaint and Motion for Discovery:

As a final matter, plaintiff has filed a letter motion, seeking to amend his complaint and requesting discovery. First, plaintiff asks solely whether "this is the proper juncture" of his civil action at which to begin pursuing discovery, and if so, whether his letter can be considered his motion to proceed with discovery. Plaintiff does not indicate what he seeks through discovery, or allege with any specificity how discovery is necessary to support or further elaborate on his claim. Because plaintiff has alleged nothing to alter the Court's determination on defendants' Motion, and because defendants are in fact entitled to summary judgment, plaintiff's discovery motion will be denied as moot.

Second, plaintiff states that although all but one of his claims was dismissed, he is "still faced with the burden of [his] medical infirmities" that he sustained in the attack. He asks whether he can amend his complaint to include the medical problems he is now facing, even though his original medical claims were dismissed. To the extent plaintiff seeks to amend his complaint for the purpose of proving the first prong of his failure to protect claim, the Court assumed that prong was satisfied, and plaintiff's claim still failed on the second prong requiring a culpable state of mind of the defendants. Therefore, any amendment regarding plaintiff's injuries for that purpose would be moot. Moreover, to the extent that plaintiff seeks to amend his complaint for the purposes of proving damages, again plaintiff's motion would be moot because of the disposition of defendants' Motion for Summary Judgment. As a result, plaintiff's Motion to Amend his complaint also must be denied as moot.

## V. Conclusion

For the above reasons, plaintiff's Motion to Amend and his Motion for Discovery will be denied as moot, and defendants' Motions for Summary Judgment will be granted. An appropriate Order shall issue.

Entered this 13th day of August 2009.

Alexandria, Virginia

/s/
Liam O'Grady
United States District Judge